UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

ADT LLC,

      Plaintiff,

          v.                    Case No. 9:12cv80898-RYSKAMP

ALARM PROTECTION TECHNOLOGY
FLORIDA, LLC, JACOB DAHL, ADAM
D. SCHANZ, ALARM PROTECTION
TECHNOLOGY, LLC, ALARM
PROTECTION TECHNOLOGY HOLDINGS,
LLC, and ALARM PROTECTION
TECHNOLOGY MANAGEMENT, LLC,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT

Plaintiff ADT LLC ("ADT"), through its undersigned counsel, brings this action

for damages and injunctive relief against Defendants Jacob Dahl ("Dahl"), Adam D.

Schanz ("Schanz"), Alarm Protection Technology Florida, LLC ("APT Florida"), Alarm

Protection Technology, LLC ("APT LLC"), Alarm Protection Technology Management,

LLC ("Management"), and Alarm Protection Technology Holdings, LLC, ("Holdings")

(together, "APT") and in support alleges:

## SUMMARY OF THE CASE

1.      This is an action for damages, attorney fees and injunctive relief arising

from the defendants' deceptive trade practices and infringing trademark.  Defendants are

interfering with ADT's contracts with its Florida customers by misleading customers into

believing that APT is ADT, by falsely stating that their ADT alarm systems are outdated

and require "upgrading," and by inducing them to install APT systems and sign APT

contracts as part of the "upgrade."  These deceptive practices violate Section 43(a) of the

Lanham Act, 15 U.S.C. § 1125(a), and the Florida Deceptive and Unfair Trade Practices

Act, Fla. Stat. §§ 501.201 *et seq*., as well as ADT's rights against interference with its

contracts under the Florida common law.  Moreover, Schanz caused APT to adopt the

APT name and trademark with the willful intent of trading on the recognition of ADT's

famous name and mark, thereby diluting the ADT trademark in violation of Section 43(c)

of the Lanham Act, and confusing the market in violation of Section 43(a) of that Act.

ADT seeks injunctions prohibiting further use of the APT name and trademark and

further use of deceptive sales tactics, as well as recovery of ADT's damages, including

statutory awards of trebled damages, recovery of APT's profits, punitive damages, and

ADT's costs and attorney fees incurred in the prosecution of this lawsuit.

## PARTIES

2.      Plaintiff ADT is a Delaware limited liability company with its principal

place of business at 1501 Yamato Road, Boca Raton, Florida 33431.

3.      Defendant APT Florida is a Utah limited liability company created in

2011 with its principal place of business at 189 N. Highway 89, Suite C-12, North Salt

Lake, Utah 84054.  APT Florida registered with the Utah Division of Corporations as

doing business under the "APT" acronym.  APT Florida registered with the Florida

Department of State to do business in Florida as a foreign limited liability company, and

maintained an office and conducted business in Palm Beach County at 1200 NW 17th

Avenue, Suite 5, Delray Beach, Florida 33445.  APT Florida's registered agent for

service of process in Florida is Registered Agent Solutions, Inc., 155 Office Plaza Drive, Suite A, Tallahassee, Florida 32301.

4.      Defendant APT LLC is a Utah limited liability company created in December 2008 with its principal place of business at 189 N. Highway 89, Suite C-12, North Salt Lake, Utah 84054. On information and belief, APT LLC owns and licenses to APT Florida the APT name and trademarks, directs and controls APT Florida's sales and marketing practices in Florida, and is in active concert with APT Florida with respect to the sales and marketing of APT's goods and services in Florida.  On information and belief, APT Florida is an agent and alter ego of APT LLC.

5.      Defendant Management is a Utah limited liability company created in December 2011 with its principal place of business at 189 N. Highway 89, Suite C-12, North Salt Lake, Utah 84054.  Management performs all of the nonsales functions of APT Florida, owns or controls the bank accounts that receive and disburse funds for APT Florida, and is in active concert with APT Florida with respect to the sales and marketing of APT's goods and services in Florida.  On information and belief, APT Florida is an agent and alter ego of Management.

6.      Defendant Holdings is a Utah limited liability company created in December 2011 with its principal place of business at 189 N. Highway 89, Suite C-12, North Salt Lake, Utah 84054.  Holdings serves as the Member of APT Florida and, on information and belief, of APT LLC and APT Management. As Member, Holdings directs and controls APT Florida's sales and marketing practices in Florida, and is in active concert with APT Florida with respect to the sales and marketing of APT's goods

and services in Florida.  On information and belief, APT Florida is an agent and alter ego of Holdings.

7.      Defendant Schanz, on information and belief, is a resident of the State of Utah.  According to Florida public records, Schanz registered APT Florida with the Florida Department of State to do business in Florida as a foreign limited liability company, and serves as APT Florida's manager member.  According to testimony by APT Florida's general manager, Schanz also serves as the "head of sales and marketing" for APT Florida, spends time in the Florida office of APT Florida, and monitors, controls and directs APT Florida's marketing and sales efforts in Florida.  On information and belief, Schanz has worked for many years in the security systems industry, most recently as a sales representative and officer of Silverline Security, another Utah security systems company that sold alarm systems in Florida and other states.  On information and belief, APT Florida is an agent and alter ego of Schanz.

8.      Defendant Dahl resides in Boca Raton, Florida, serves as Regional Sales Manager for APT Florida, and maintained an office for APT Florida as well as for nonparty Same Day Enterprises, Inc., at 1200 NW 17th Avenue, Suite 5, Delray Beach, Florida 33445.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to section 1331 of title 28 because it presents a Federal question under Section 43 of the Lanham Act.

10.      This Court has supplemental jurisdiction over the state-law claims also asserted in this action pursuant to section 1367(a) of title 28.

11.     Venue lies in this District pursuant to section 1391(b) of title 28 because defendants reside or are otherwise found in this District, and because a substantial number of the events giving rise to the claims asserted in this Complaint occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

12.     ADT, founded in 1874, is the oldest, largest and best-known provider of electronic security services and equipment for homes and businesses in the United States.

13.     ADT provides security services and equipment nationwide and is engaged in interstate commerce for the purposes of the Lanham Act.

14.     ADT's name and trademarks are registered with the United States Patent and Trademark Office.

15.     Defendant Schanz has worked in the security systems industry for a number of years.  Schanz's experience made him aware of ADT and of ADT's prominence in the security systems market.

16.     In 2008, while working as a sales representative for Silverline Security, Schanz decided to open his own alarm company and call it APT.  By choosing a three-letter acronym that varied from ADT's by only a middle letter, Schanz sought to confuse the two marks, and to appeal to customers' esteem for ADT in the sale of APT products and services.

17.     Schanz filed articles of organization for APT LLC with the Utah Department of Commerce on December 30, 2008, that made Schanz the sole Manager of the company.

18.     Schanz chose the name "Alarm Protection Technology," designed the "APT" acronym and trademark, and began to create his own alarm company around the "APT" brand.

19.     By 2010, Schanz had created a website branded with the infringing APT acronym. The website used the domain name "aptsafe.com"; it prominently displayed the APT trademark on each page; it was built around the slogan, "You're not safe until you're APT safe"; and it referred customers to a toll-free number featuring the APT acronym, 800.APT.3008.

20.     The site remains online at www.aptsafe.com, and continues to feature the infringing domain name, trademark and toll-free number.

21.     Schanz also developed marketing materials containing the APT acronym and trademark.  Schanz designed APT's signage featuring the infringing APT trademark.

22.     Schanz, as "Executive Producer," produced an APT LLC video advertisement that APT LLC published to the Internet on December 11, 2011. The advertisement prominently featured the APT trademark and the APT slogan, "You're not safe until you're APT safe."

23.     It was not until after Schanz and APT LLC had already developed the infringing APT brand and launched the APT website that Schanz created the other APT affiliates.

24.     Schanz organized APT Florida as a Utah company in June 2011, and named himself as its Manager.  Schanz registered the infringing name "APT Florida" as a "doing business" name with Utah.  Schanz registered similar infringing "doing business" names using the APT acronym for other newly-created state-level APT sales affiliates.

Schanz also registered APT Florida as a foreign limited liability company with the Florida Department of State.

25.     Schanz spent time in Florida in connection with the creation and organization of APT Florida.

26.     In December 2011, Schanz organized defendant Holdings using the infringing trade name, "APT Holdings, LLC," and named himself as its Manager. Holdings serves as Member of APT Florida and, on information and belief, the other APT affiliates as well.  On information and belief, Schanz is the sole member of Holdings.  Through Holdings, Schanz owns and controls all of the other APT operating companies.

27.     At the same time, Schanz also organized defendant Management to handle most operational functions of APT Florida and, presumably, the other APT operating companies.  Management provides APT Florida with bookkeeping, accounting and administrative services; receives payments from APT Florida customers; pays APT Florida sales agents; provides customer support for APT Florida's customers; and conducts the "Welcome Calls" for new APT Florida customers.

28.     Schanz is shown in the Utah public records as the Organizer and Manager of each APT company.

29.     APT and ADT are direct competitors in the security systems markets. ADT and APT market and sell substantially identical goods made by the same suppliers through the same channels to the same target markets of residential consumers.  The companies also provide substantially identical security monitoring services to their

respective customers. On information and belief, APT operates in at least sixteen states, all of which are also served by ADT.

30.     Schanz caused the various APT affiliates to adopt names and trademarks that are confusingly similar to ADT's name and mark. The ADT mark features the ADT acronym set in white sans-serif capital letters on a blue field.  The APT mark featured the APT acronym, also in white sans-serif capital letters against a blue field.  The two acronyms differ by only their middle letters, "D" and "P."  They look alike, and they sound alike – similarities that are especially confusing in APT's principal sales channel, door-to-door sales.  Schanz intentionally caused APT LLC, APT Florida, Management, Holdings, and APT LLC's other subsidiaries and affiliates to adopt the APT name and mark to confuse the market, capitalize on ADT's goodwill among consumers, prey on consumers' trust in ADT, and acquire customers who believe they are trading with ADT.

31.     Defendant Dahl worked as a Florida "regional sales manager" of APT Florida, formerly with an office in Delray Beach, that APT Florida has since closed. Before working at APT Florida, Dahl worked as a sales manager at APX Alarm Security Solutions, Inc. ("APX"), another ADT competitor that operated in New York.

32.     In addition to Dahl's duties as Regional Sales Manager, Dahl also manages APT Florida's Florida offices.  Dahl reports to defendant Schanz.

33.     APT Florida has no salaried employees in Florida.  APT Florida's Manager, Schanz, works from APT's offices in Utah.  APT Florida's General Manager, Richard Brimhall, spends no time in Florida, also serves as General Manager of APT LLC, and also works from APT's offices in Utah.

34.     Schanz serves a number of functions with each of the APT affiliates.
Schanz serves as the Manager of each of the APT affiliates.  On information and belief,
Schanz serves as the sole Member of APT Holdings, which in turn serves as the sole
Member of APT Florida and, on information and belief, the other APT affiliates.
Through APT Holdings, Schanz is the ultimate owner of all the APT affiliates.

35.     According to the testimony of Richard Brimhall, Schanz serves as "head
of sales and marketing" for APT Florida, and directs and monitors the efforts of APT
Florida's sales staff.  In his capacity as head of APT Florida's sales and marketing, and as
APT Florida's manager and ultimate owner, Schanz has controlled, directed, and actively
participated in the false and deceptive trade practices set forth in this Complaint.

36.     APT LLC has also controlled, directed, and participated in the false and
deceptive practices set forth in this Complaint by monitoring and controlling the efforts
of APT Florida's sales agents, by enabling APT Florida to use the infringing APT name
and trademark, and by publishing the infringing APT website and video advertisements.
APT LLC has established a code of conduct for its subsidiaries' sales agents, trains the
agents, monitors their compliance with APT LLC's practices and policies, and requires
the discharge of agents who are found to be in violation of those practices and policies.

37.     APT Florida, APT LLC, Management and Holdings appear to be alter
egos.  Schanz owns and controls APT LLC, APT Florida and Management through his
holding company, Holdings.  Schanz serves as each's manager, and also serves as APT
Florida's "head of sales and marketing" from APT LLC's headquarters in Utah.

38.     APT Florida has no existence independent of the other APT affiliates.
APT Florida exists only to generate sales in Florida for APT and Schanz.  APT Florida

does not transact business for any entities other than its APT sister affiliates.  APT

Florida does not market the products or services of companies other than APT

companies.  APT Florida has no salaried employees.  APT Florida relies upon APT

Management and APT LLC for its administrative and operational functions, and for

support for its marketing, customer support, and customer communications functions.

39.     On information and belief, APT Florida is inadequately capitalized.  APT

Florida's revenues are deposited into bank accounts owned or controlled by Management.

APT Florida's commissions owed to its sales agents are paid from those same

Management accounts.  On information and belief, Schanz structured APT Florida's

cashflows to place APT Florida's cash beyond the reach of APT Florida's creditors.  APT

Florida has closed its Delray Beach office, and does not occupy offices in Utah,

notwithstanding the contrary representations set forth in its filings with the Utah

Department of Commerce.

40.     Schanz formed APT Florida in 2011 as a mere instrumentality, to deploy a

Florida sales force comprised entirely of "independent contractors" supposedly beyond

the control of APT Florida and the other APT affiliates, to achieve Schanz's illegal

purpose of acquiring new customers through the use of a confusing trademark and

deceptive trade practices in disregard of the Lanham Act and the FDUTPA, without any

legal consequence to Schanz.

41.     APT LLC, Management, Holdings and Schanz, by monitoring, directing

and controlling the actions of APT Florida, Dahl, and ADT's other sales agents, have at

all times been in active concert with APT Florida and Dahl in their common efforts to

confuse the market by the deployment of an infringing trademark and by the use of

deceptive trade practices that are intended to mislead customers into believing that they are trading with ADT.

42.    Defendants operate their business in a culture that tolerates and even encourages false and deceptive sales practices.  Defendants equip APT's sales staff with APT contracts, APT business cards, APT yard signs, APT shirts, APT identification badges, and the authority to speak and sign contracts on APT's behalf.  Defendants also purport to train, monitor and control APT Florida's sales agents.  Nonetheless, defendants maintain that APT's sales staff is comprised entirely of "independent contractors" beyond APT's control, and that APT cannot be held accountable for any false or deceptive sales practices that APT's sales staff might employ to win new customers for APT.

43.    APT's general manager testified that it is of no concern to APT LLC or APT Florida that APT's sales agents employ false titles or engage in other fraudulent behavior to win new customers because they are "independent contractors" supposedly beyond APT's reach.  The general manager also testified to his own practice of using false titles to sell APT products to consumers.  Such testimony demonstrates an ingrained and flagrant disregard for truth-telling at the very highest level of APT's operations.

44.    Defendants have engaged in a campaign to increase APT's Florida market share through the use of false and misleading sales tactics at ADT's expense.  On information and belief, defendants target ADT customers by seeking houses with the distinctive ADT sign that ADT's customers post on their premises to deter burglars and trespassers.

45.    Defendants solicit those ADT customers with deceptive sales pitches that are intended to mislead (and are misleading) ADT's customers into believing that

defendants represent ADT or are affiliated with ADT.  Defendants use these pitches to induce ADT customers to sign APT contracts and install APT systems under the guise of "upgrading" their ADT service.

46.     Defendants' deceptive practices are injuring ADT by causing ADT's customers to uninstall their ADT equipment, install APT equipment, terminate their ADT contracts, and execute new contracts for security services with APT.

47.     As part of its business, ADT has developed confidential information regarding the identities and security system specifications of each of its customers.  This information is highly valuable within the industry, is not generally known or attainable by others, and is frequently the subject of expensive purchase agreements between competing security systems providers.  Defendants' gathering of confidential ADT customer alarm system data while posing as ADT representatives amounts to a theft of ADT's trade secrets.

48.     Defendants, by falsely representing to ADT customers that their ADT security systems are outdated and vulnerable to burglars, or are in need of "upgrades," damage ADT's goodwill and reputation as a reliable provider of security services.

49.     As a result of defendants' practices, a number of ADT customers have unwittingly found themselves with APT systems installed in their homes, and with contractual obligations to both APT and ADT.  In some instances, ADT has been required to send technicians to the deceived customers' houses to reinstall the removed ADT equipment, at considerable expense to ADT.  In others, the customers retained their APT systems, and terminated their ADT contracts.

50.     Such practices, as alleged in greater detail below, violate statutory and common-law prohibitions against the use of false and deceptive statements in commerce. They also violate the security systems industry's own Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name … at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices, *inter alia*, (a) any claim that a competitor is going out of business, (b) any claim that the company is taking over the competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

51.     ADT has received a number of calls from its Florida customers reporting visits from Dahl and other APT representatives, and expressing confusion as to whether they are affiliated with ADT.  ADT offers the following examples to illustrate defendants' deceptive and tortious acts.

### Mona Gartrell

52.     On February 18, 2012, Dahl visited the home of ADT customer Mona Gartrell, in West Palm Beach.

53.     Dahl falsely stated that he represented ADT.

54.     Dahl falsely claimed to have knowledge of the installation and features of Ms. Gartrell's ADT alarm system.

55.     Dahl falsely stated that Ms. Gartrell's alarm system required an upgrade because her neighborhood had experienced burglaries that her existing equipment could not reliably prevent.

56.     Dahl falsely claimed that Ms. Gartrell's ADT system was not "top-notch" and could be defeated by cutting telephone wires to the system.  In fact, Ms. Gartrell's system employs wireless technology to protect against cut telephone wires.

57.     Dahl wore a shirt with an APT insignia, which resembles ADT's and is intended to confuse ADT customers.  Dahl did not disclose that APT is not related to ADT, or that ADT and APT are competitors.

**<u>Mary Demps</u>**

58.     On May 4, 2012, Dahl visited the home of ADT customer Mary Demps, in Miami.

59.     Dahl falsely claimed to represent ADT, and falsely stated that ADT uses APT equipment.

60.     Dahl falsely stated that ADT was "upgrading" Ms. Demps's alarm system because her neighborhood had "a lot of break ins" that required new alarm systems.

61.     Dahl falsely stated that ADT would upgrade Ms. Demps's ADT alarm system for free in exchange for executing a new contract.  Ms. Demps agreed.

62.     Fifteen minutes later, APT technician Michael Helton arrived, removed all of ADT's monitoring equipment installed at Ms. Demps's premises, and replaced it with APT equipment, representing it as an "upgraded system."

63.     Neither Dahl nor Helton disclosed to Ms. Demps that they worked for APT, not ADT; that APT is not related to ADT; that, to the contrary, APT and ADT are competitors; or that the new contract Ms. Demps signed in consideration for the "upgrade" was duplicative of Ms. Demps's existing security services contract with ADT.

64.     Such misconduct misled Ms. Demps to believe that she was acquiring an
ADT upgrade, not contracting for new service from an ADT competitor.

### Marilyn Hipple

65.     In May 2012, Dahl visited the home of ADT customer Marilyn Hipple, in
Vero Beach.

66.     Dahl falsely claimed to represent ADT.

67.     Dahl falsely stated that recent burglaries in Ms. Hipple's neighborhood
required the installation of new alarm equipment.

68.     Dahl falsely stated that ADT would provide a free "upgrade" to Ms.
Hipple's alarm system to protect against these burglaries.

69.     Ms. Hipple agreed.  Dahl had Ms. Hipple sign some "paperwork" for the
"upgrade," then brought APT technicians into the house and had them replace Ms.
Hipple's ADT equipment with APT equipment.

70.     The installers posted a yard sign in front of Ms. Hipple's house stating that
the premises were protected by APT.  When Ms. Hipple asked about the sign, the
installers falsely stated that they were ADT sales representatives.

71.     Upon reading the "paperwork," Ms. Hipple realized that she had signed a
five-year contract for alarm services with APT.

72.     Neither Dahl nor the installers ever disclosed to Ms. Hipple that they
worked for APT, not ADT; that APT is not related to ADT; that, to the contrary, APT and
ADT are competitors; or that the new contract Ms. Hipple signed in consideration for the
"upgrade" was duplicative of Ms. Hipple's existing security services contract with ADT.

73.     Such misconduct misled Ms. Hipple to believe that she was acquiring an ADT upgrade, not contracting for new service from an ADT competitor.

**Nieves Nunes**

74.     On May 30, 2012, an unnamed APT representative visited the home of ADT customer Nieves Nunes, in Homestead, Florida.

75.     The representative falsely stated that he was an ADT representative.

76.     The representative falsely stated that Ms. Nunes's ADT security system required an update.

77.     The representative falsely stated that there had been many burglaries in the neighborhood, and that unupdated ADT security systems were unreliable and "easy to break into."

78.     The representative falsely stated that the upgrade would be free because Ms. Nunes was "already a customer."

79.     The representative provided Ms. Nunes with a contract to sign, and her daughter signed it in her behalf.

80.     Later that day, an APT technician visited Ms. Nunes's house, removed her ADT equipment, and installed APT equipment in its place.

81.     Neither APT representative disclosed to Ms. Nunes that they worked for APT, not ADT; that APT is not related to ADT; that, to the contrary, APT and ADT are competitors; or that the new contract Ms. Nunes signed in consideration for the "upgrade" was duplicative of Ms. Nunes's existing security services contract with ADT.

82.     Such misconduct misled Ms. Nunes to believe that she was acquiring an ADT upgrade, not contracting for new service from an ADT competitor.

**Robert Wimberly**

83.     On June 13, 2012, APT representative Mike Moncur visited the home of ADT customer Robert Wimberly, in Miami, Florida.

84.     Mr. Moncur stated he worked for APT.  However, Mr. Moncur falsely stated that he was there to "upgrade" Mr. Wimberly's ADT security system.

85.     Mr. Moncur falsely stated that threats of recent burglaries required an "upgrade" of Mr. Wimberly's security system to protect against them.

86.     Mr. Wimberly agreed to an upgrade of his ADT system. An APT technician removed Mr. Wimberly's ADT equipment and installed APT equipment in its place.

87.     Neither APT representative disclosed to Mr. Wimberly that APT is not related to ADT, or that, to the contrary, APT and ADT are competitors.

88.     Such misconduct misled Mr. Wimberly to believe that he was acquiring an ADT upgrade, not contracting for new service from an ADT competitor.

**Hilda Gillet**

89.     On August 11, 2012, an unnamed APT representative visited the home of ADT customer Hilda Gillet, in Miami.

90.     The APT representative claimed to be visiting from "the alarm company," a statement intended to make Ms. Gillet believe he was from Ms. Gillet's alarm company, ADT.

91.     When Ms. Gillet asked if he represented ADT, the APT representative falsely stated there is "no more ADT," that the company had changed its name to APT.

92.     The APT representative falsely stated that Ms. Gillet's ADT system required an "update" to protect against burglaries.

93.     Based on the false statements, Ms. Gillet believed the representative to be from ADT, and allowed him into her home.  The representative sold Ms. Gillet a new APT security system.

94.     Later that day, an APT technician visited Ms. Gillet's home, removed the ADT system, and installed the new APT system in its place.

95.     Neither APT representative disclosed to Ms. Gillet that APT is not related to ADT, or that, to the contrary, APT and ADT are competitors.

96.     Ms. Gillet did not understand that she had signed a contract with a different company until she received her monthly ADT bill as well as an APT bill. Although deceived by APT, Ms. Gillet has chosen to remain an APT customer.

### Mary Trovato

97.     Dahl is no newcomer to the use of deceptive practices to market services to ADT's customers.  Dahl has used the same deceptions to market the security systems of ADT's competitor APX to ADT customers outside Florida.

98.     For example, Dahl, then an employee of APX, on May 14, 2010, visited the home of ADT customer Mary Trovato, in Rochester, New York.

99.     Ms. Trovato does not speak or read English fluently, and asked Dahl to telephone her daughter, Connie Tascione.

100.    On the telephone, while in Ms. Trovato's home, Dahl falsely told Ms. Tascione that he was from ADT.

101.     Dahl falsely told Ms. Tascione that Ms. Trovato's ADT system was "too old" and required an "upgrade."

102.     Dahl falsely told Ms. Tasccione that he would perform a free "upgrade" to Ms. Trovato's ADT security system, and that Ms. Trovato would need to sign "paperwork" for her "upgrade."

103.     Based on these falsehoods, Ms. Tascione advised her mother to sign the papers.  Ms. Trovato did so.

104.     The following day, an APX technician removed the ADT equipment from Ms. Trovato's home and replaced it with APX equipment.

105.     Upon receiving calls from ADT to report system failures, Ms. Tascione visited her mother, reviewed the "paperwork," and learned that Dahl had induced her mother to sign a new contract for security services with APX, not ADT.

106.     Dahl never disclosed to Ms. Tascione or Ms. Trovato that he worked for APX, not ADT; that APX was not related to ADT; or that, to the contrary, APX and ADT were competitors.

### COUNT I
**(Against APT LLC, APT Florida,
Management, Holdings, and Schanz)
TRADEMARK INFRINGEMENT IN VIOLATION
OF THE LANHAM ACT, 15 U.S.C. §§ 1125(a) & 1125(c)**

107.     Plaintiff incorporates Paragraphs 1 through 106, as if set forth fully here.

108.     Plaintiff's "ADT" name and trademarks are registered with the United States Patent & Trademark Office.  ADT was founded in 1874 to operate a national network of telegraph operators and other signaling companies throughout the United States.  Since at least 1935, ADT has been marketing alarm systems using the company's

signature trademark consisting of the three-letter ADT acronym, set in white capital sans-serif letters.

109.    Plaintiff's "ADT" trademark is a famous mark for the purposes of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).  Since the 1930s, ADT has continuously mounted national print and broadcast media advertising campaigns featuring the ADT trademark for the marketing and sale of its security systems equipment and services.  In addition, most of ADT's customers across the country post yard and wall signs bearing the ADT trademark in prominent locations on their premises to deter burglars and trespassers from entering, making the ADT trademark a common sight in many communities.  The ADT trademark is a key identifier for ADT, and it is recognized and known by general consumers and would-be criminals alike throughout the United States as the trademark of the nation's leading provider of security services.

110.    Schanz, created APT LLC, APT Florida, Management, Holdings, and their respective subsidiaries and affiliates within the past four years, and caused them all to adopt their APT trademark decades after ADT's trademark had become famous in the general marketplace.

111.    The APT trademark is confusingly similar to ADT's trademark.  The APT mark also features a three-letter acronym set in white sans-serif capital letters against a blue field.  The APT acronym differs by only one letter from ADT's. The two acronyms look alike.  The two acronyms sound alike when spoken by door-to-door salesmen, the principal channel for APT's sales and marketing efforts.

112.    ADT and APT are competitors that market, sell and install the same types of electronic security systems and monitoring services, using the same equipment from

the same manufacturers, to the same target residential customers through the same sales channels in the same geographic locations.  The target customers are unsophisticated consumers who lack especial prior knowledge of the security systems market.

113.    Schanz, through Holdings and Management, caused APT LLC, APT Florida, and APT LLC's other subsidiaries and affiliates to adopt and use in commerce the APT name and trademark with the willful intent of trading on the recognition of the ADT trademark, and of cashing in on ADT's goodwill, reputation and customer base in the security systems market.  Holdings and Management are also responsible for ADT's damages as alter egos of Schanz, APT Florida and APT LLC.

114.    The APT name and trademark cause actual confusion in the marketplace, misleading consumers into believing that APT is affiliated with ADT, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

115.    The use by APT LLC, APT Florida, Management, Holdings, and APT LLC's other subsidiaries and affiliates of the APT name and trademark has caused, and will continue to cause, dilution by blurring of the ADT trademark in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

116.    ADT has been and will continue to be damaged as a result of APT's infringing name and trademark by reason of the market confusion they cause.

117.    ADT is entitled to an injunction pursuant to 15 U.S.C. §§ 1116(a) and 1125(c)(1) barring APT LLC, APT Florida, Management, Holdings, and APT LLC's other subsidiaries and affiliates from further use of the APT name and trademark.

118.    ADT is entitled to an award of trebled compensatory damages, as well as defendants' profits, and attorney fees and the costs of this action pursuant to 15 U.S.C. § 1117(a).

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Schanz, APT LLC and APT Florida, and award the following relief:

a.      An order pursuant to 15 U.S.C. §§ 1116(a) and 1125(c)(1) preliminarily, and permanently thereafter, restraining and enjoining APT LLC, APT Florida, Management, Holdings, and APT LLC's other subsidiaries and affiliates, and their respective agents, servants, employees, officers, attorneys, successors and assigns, from any further use of the APT name or trademark in the market for security systems equipment and services;

b.      An accounting of the profits of APT LLC, APT Florida, Management, Holdings, and APT LLC's other subsidiaries and affiliates resulting from their use of the APT name and trademark, and payment of such profits to ADT;

c.      Compensatory damages, trebled, as provided by 15 U.S.C. § 1117(a), in an amount to be established at trial;

d.      Attorney fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

e.      Such other and further relief as the Court may deem appropriate in the circumstances.

**COUNT II**
**(Against all defendants)**
**UNFAIR COMPETITION IN VIOLATION**
**OF THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)**

119.    Plaintiff incorporates Paragraphs 1 through 106, as if set forth fully here.

120.    APT Florida, through Dahl and APT's other sales agents, supervised and directed by Schanz, marketed APT's goods and services by making false and deceptive representations to ADT's customers in Florida.

121.    APT Florida, through Dahl and APT's other sales agents, supervised and directed by Schanz, falsely stated to ADT's customers that ADT is going out of business in Florida.

122.    APT Florida, through Dahl and APT's other sales agents, supervised and directed by Schanz, falsely stated to ADT's customers that their ADT security systems are outdated and unsafe, and incapable of protecting ADT's customers from burglaries without "upgrades."

123.    Dahl and APT's other sales agents, supervised and directed by Schanz, falsely identified themselves to ADT's customers as representing ADT, or as being related to ADT.

124.    APT Florida, through Dahl and APT's other sales agents, supervised and directed by Schanz, offered to ADT's customers free "upgrades" to their ADT security systems without disclosing that they are competitors of ADT seeking to replace ADT's equipment and services, not upgrade them.

125.    These statements are literally false.

126.     APT Florida, through Dahl and APT's other sales agents, supervised and directed by Schanz, made each of the false statements with the intent of deceiving ADT's customers as to the relationship or affiliation of APT with ADT.

127.     These false and misleading statements have created confusion among consumers, and will continue to do so if permitted to continue.

128.     On information and belief, APT LLC and Management actively participated in these false and deceptive sales practices by licensing the APT name and trademark to APT Florida, by conducting "Welcome Calls" with prospective APT Florida customers, by providing Clarification Questionnaires, contracts, and other APT-branded materials for APT Florida to use, and by providing operational, managerial, compliance and other services to APT Florida.

129.     Schanz, through APT LLC, Management and Holdings, controlled, directed, and actively participated in these false and deceptive practices, acting at all times in active concert with APT Florida and Dahl in their efforts to confuse Florida consumers.   Schanz, APT LLC, Management, and Holdings are also responsible for ADT's losses as alter egos of APT Florida.

130.     ADT has been and will continue to be damaged as a result of Defendants' false statements, by the confusion of the market for ADT's goods and services, by the disruption of ADT's relationship with its customers, by the diversion of ADT's customers to defendants, by loss of confidential information relating to ADT's customers, and by damage to ADT's goodwill and reputation as a reliable provider of security systems.

131.    ADT is entitled to an injunction pursuant to 15 U.S.C. § 1116(a) barring defendants from further violations of 15 U.S.C. § 1125(a).  Given APT's *laissez-faire* disregard of its "independent contractor" sales agents' deceptive trade practices, Dahl's history at APX of selling security services to ADT's customers through these same deceptive practices, Dahl's ongoing involvement in the training of APT's sales agents, and the apparent pervasive use by the other APT sales agents of abusive sales tactics identical to Dahl's, defendants are likely to continue to engage in such practices unless they are enjoined by this Court from further violations.

132.    ADT is entitled to an award of trebled compensatory damages, as well as defendants' profits, and attorney fees and the costs of this action pursuant to 15 U.S.C. § 1117(a).

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

a.    An order pursuant to 15 U.S.C. § 1116(a) preliminarily, and permanently thereafter, restraining and enjoining defendants, and their agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from

(1) making any false or misleading statement, or a statement that is likely to or intended to confuse an ADT customer or potential customer, regarding any relationship between ADT and APT, Dahl, or APT's other agents; or

(2) making any false or misleading statement, or a statement that is likely to or intended to confuse an ADT customer or potential customer,

regarding the function, performance, capabilities, specification, features, requirements, reliability, availability, origin, sponsorship, approval, or design of any ADT equipment, security systems, or services, or to misrepresent to any ADT customer that such customer's ADT security system is outdated or deficient; or

(3) making any false of misleading statement, or a statement that is likely to or intended to confuse an ADT customer or potential customer into believing that ADT is no longer doing business or has curtailed its services.

b.      An accounting of defendants' profits resulting from their deceptive practices, and payment of such profits to ADT;

c.      Compensatory damages, trebled, as provided by 15 U.S.C. § 1117(a), in an amount to be established at trial;

d.      Attorney fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

e.      Such other and further relief as the Court may deem appropriate in the circumstances.

### COUNT III
**(Against all defendants)**
**VIOLATION OF THE FLORIDA DECEPTIVE & UNFAIR**
**TRADE PRACTICES ACT, FLA. STAT. §§ 501.201 ET SEQ.**

133.    Plaintiff incorporates Paragraphs 1 through 106, as if set forth fully here.

134.    Defendants, by selling APT security systems and services, are engaged in "trade or commerce" as defined in Section 501.203(8) of the Florida Statutes.

135.    Defendants have intentionally engaged in deceptive and unfair trade practices in violation of Section 501.204(1) of the Florida Statutes by falsely representing to ADT's customers that their ADT security systems are outdated and unsafe; that ADT's security systems are incapable of protecting ADT's customers from burglaries without "upgrades"; that Dahl and APT's other agents are from ADT, or are affiliated with ADT; and that they will provide free "upgrades" to their ADT security systems without disclosing that they are competitors of ADT, seeking to replace ADT's equipment and services, not upgrade them.

136.    These practices are commonly recognized by industry members as deceptive and unfair trade practices that are intended to confuse and mislead consumers, and that have specifically been barred as such by the security systems industry's code of ethics, as well as by APT's own code of conduct.

137.    Defendants' misrepresentations were likely to, and did, mislead ADT's customers into believing that they were continuing and "upgrading" their ADT security services, when in fact defendants were inducing them to sign new contracts for new services from APT.

138.    ADT is entitled to injunctive relief pursuant to Section 501.211(1), Florida Statutes, as one aggrieved by defendants' violation of the Act.  Given APT's *laissez-faire* disregard of its "independent contractor" sales agents' deceptive trade practices, Dahl's history at APX of selling security services to ADT's customers through these same deceptive practices, Dahl's ongoing involvement in the training of APT's sales agents, and the apparent pervasive use by the other APT sales agents of abusive sales tactics

identical to Dahl's, defendants are likely to continue to engage in such practices unless they are enjoined by this Court from further violations.

139.    ADT has been aggrieved by defendants' violations of the Act, and is entitled to its actual damages suffered as a result of those violations, plus its attorney fees and costs as provided in Section 501.211(2) of the Florida Statutes.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

a.    An order pursuant to Fla. Stat. § 501.211(1) preliminarily, and permanently thereafter, restraining and enjoining defendants, and their agents, servants, independent contractors, subsidiaries, affiliates, employees, officers, attorneys, successors and assigns, from

(1) making any false or misleading statement, or a statement that is likely to or intended to confuse an ADT customer or potential customer, regarding any relationship between ADT and APT, Dahl, or APT's other agents; or

(2) making any false or misleading statement, or a statement that is likely to or intended to confuse an ADT customer or potential customer, regarding the function, performance, capabilities, specification, features, requirements, reliability, availability, origin, sponsorship, approval, or design of any ADT equipment, security systems, or services, or to misrepresent to any ADT customer that such customer's ADT security system is outdated or deficient; or

(3) making any false of misleading statement, or a statement that is likely to or intended to confuse an ADT customer or potential customer into believing that ADT is no longer doing business or has curtailed its services.

b.      Actual damages as provided by Fla. Stat. § 501.211(2), in an amount to be established at trial;

c.      Attorney fees and costs incurred in the prosecution of this action, as provided by Fla. Stat. § 501.211(2); and

d.      Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT IV
### (Against all defendants)
### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

140.    Plaintiff incorporates Paragraphs 1 through 106, as if set forth fully here.

141.    A valid contract existed between ADT and each of the ADT customers whom defendants solicited.

142.    Defendants were well aware of these contracts.  Indeed, defendants built their entire "upgrade" sales scheme upon the presumed existence of these contracts.

143.    Defendants intentionally procured the termination of these contracts.

144.    Defendants' encroachment into ADT's contracts with its customers was accomplished through deception, without justification or legal privilege.

145.    Defendants' intentional encroachment into ADT's contracts caused ADT harm.  ADT is entitled to compensatory and punitive damages as a result.

146.     Schanz, ADT LLC, Management, and Holdings are also responsible for ADT's losses as alter egos of APT Florida.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

   a.     Compensatory damages in an amount to be established at trial;

   b.     Punitive damages in a sum sufficient to deter defendants from engaging in further deceptive sales tactics; and

   c.     Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT V
### (Against all defendants)
### COMMERCIAL DISPARAGEMENT

147.     Plaintiff incorporates Paragraphs 1 through 106, as if set forth fully here.

148.     Defendants' sales activities include statements about ADT equipment and services that are false.

149.     Defendants' false and deceptive sales tactics demean the quality of ADT's goods and services.

150.     These tactics have caused and will continue to cause ADT to lose sales and good will, and to suffer damages.

151.     Schanz, ADT LLC, Management, and Holdings are also responsible for ADT's losses as alter egos of APT Florida.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Defendants, and award the following relief:

   a.     Compensatory damages in an amount to be established at trial;

b.      Punitive damages in a sum sufficient to deter defendants from

engaging in further deceptive sales tactics; and

c.      Such other and further relief as the Court may deem appropriate

in the circumstances.

## **JURY DEMAND**

ADT demands a jury trial of all issues triable to a jury.

Dated:  April 24, 2012                                Respectfully submitted,

s/ C. Sanders McNew

_____
C. Sanders McNew
mcnew@mcnew.net
Florida Bar No. 0090561
McNEW P.A.
2385 NW Executive Center Drive
Suite 100
Boca Raton, Florida  33431
Tel:  (561) 299-0257
Fax: (561) 299-3705

*Counsel for the Plaintiff, ADT LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of April, 2013, I caused a true and correct copy of the foregoing Second Amended Complaint to be served by CM/ECF on all parties listed to receive electronic service for this case, as listed below:

**CM/ECF Participants**
Michael Marcil, Esq.
J. Ryan Mitchell, Esq.
Russell A. Nevers, Esq.

/s C. Sanders McNew
_____
C. Sanders McNew